Our next case for today is 2025-10534, W.M. M. et al. v. Donald J. Trump et al. We'll hear from Lee Gillard. Is it Gillard? Yes. Thank you, Your Honor. Good morning to you both, Your Honor. May it please the Court, Lee Gillard from the ACLU for Petitioner's Appeal. I just wanted to make a few quick points before questioning. To start, the TDA is committing ordinary crimes that have been dealt with by law enforcement. That's been clear throughout. But even if there is capture and evacuation, it's obviously being treated as a law enforcement situation. There is no question that there are multiple immigration laws for swift deportation, including, in fact, an alien terrorist court, that there are obviously criminal laws. If any member of TDA is committing crimes, the amicus brief by a broad, bipartisan group of high-level former government officials lays out all the ways in which people can be dealt with and have traditionally been dealt with for ordinary crimes. So the issue is not whether TDA is dangerous or whether they're going to be allowed to stay in the country if they're, in fact, TDA or committing crimes. The question is whether the extraordinary power of the Alien Enemies Act, dating back to 1798, is the right fit here. It is not. It is not. That act is not for peacetime, for going after dangerous individuals, even if somehow they're informally connected to a corrupt regime. The Alien Enemies Act is about wartime and it's about military. That's clear from the history. I want to make just a few notable points about the historical context, but I would suggest that the court, if it happens, can look at the amicus briefs filed, the historical briefs by Professor King, by Professor Solman, the Bremen Center, to see which lay out the history fairly comprehensively and show that the government has cherry-picked material, has incorrectly cited material, or cited it out of context. But the few points that I want to make right now are, first, as indicated by the title of the act, Alien Enemies, that is a wartime concept, and that's laid out very clearly in the Supreme Court's World War II decision in Eichentrader. What it means is when we're at war with another country, every national of that country is an enemy alien, not because there's particular suspicion about an individual, but because they're assumed to have loyalty to that sovereign nation. It is not a peacetime concept. It is specifically about wartime. The government's few citations trying to get out from under that are simply wrong. And so that's the first indication that the Alien Enemies Act is a wartime military authority. The second is a piece of historical context that was stressed by the panel and stressed by Judge Henderson in the D.C. Circuit, and that's the comparison between the Alien Enemies Act and the Alien Friends Act. The Alien Friends Act was enacted simultaneously, was extremely controversial in the last two years. The reason is because it allowed the president to make enemies, enemy aliens, where those individuals were deemed to be a danger to the public safety of the United States or known as they were engaged in secret treasonous or secret machinations. The reason it was controversial and allowed to lapse is because Congress didn't think it had the power to make enemy aliens outside of war. And so it allowed it to lapse. The reason, in contrast, the Alien Enemies Act was not deemed controversial was it was confined to wartime and military. And so that is as clear evidence as you can get that the Alien Enemies Act was about wartime military. It was enacted pursuant to Congress's war powers. The second thing about the Alien Friends Act that I think was likewise stressed by the panel and Judge Henderson correctly was that it's a perfect fit for what the government's doing here. It's peacetime. It's going after particular individuals who are not fighting out in the open. They're engaged in secret machinations or, if the government claims, danger to peace and safety, but it's during peacetime. So that would have been the fit. Now, the modern day, of course, is criminal laws and deportation laws. The final point I want to make very quickly is that because Congress enacted the Alien Enemies Act pursuant to its war powers, it would have jealously guarded those war powers. It would have not given the President a blank check and, indeed, it covered the statutes very, very specifically, not where the President deemed the statute of requisites met, but where they are met. Congress in that time would never have simply given a blank check for the war powers to be used by the President any time he considered it valuable. This would only be the fourth time in the country's history in which the Alien Enemies Act has been used. Every single time it was during war and made every national in the other country, as the concept makes clear, an enemy alien. The Supreme Court has cautioned repeatedly, be careful, be hesitant about finding sweeping new power in an old statute. If ever that admonition applied, it applies here. So when you say wartime, over here, when you say wartime, are you suggesting that an act of war is required in order to trigger use of the statute? Over here. Oh, I'm sorry. That's quite all right. There's a lot of us up here. Are you saying that an act of war, a declaration from Congress, is required for the statute to become operative? No, Your Honor, and I'm glad you asked that question. So the way the statute is phrased, obviously, is not just a declared war. It's an invasion or predatory incursion. So the reason that Congress did that is because they often were not in session at the time, and so if there was an attack, they didn't want the President to be flat-footed. So if there was actually a military invasion, which is more an attempt to actually hold territory or a quick strike incursion, the President could use that, and then the thought would be that Congress would eventually declare war, just as with Pearl Harbor. But there doesn't have to initially be a declared war. Now, the first few times there was, but the key is, of course, that incursion and invasion go along with declared war, and so there'd have to be a magnitude of military invasion in a wartime context, but there doesn't have to be a declared war. But who decides that, regardless of context? You mentioned maybe Congress wouldn't be in session, but who would make that determination? Is that not part and parcel of the executive's power? Oh, no question, Your Honor. And so the President would make that determination. My point simply is that Congress didn't give a blank check in the sense of there'd be no judicial review. And so I'm responding to the government's position that once the President does it, that's the end. I mean, so the Starboard JDT, the Supreme Court's recent decision saying there is judicial review, and Congress would have very specific prerequisites for the President to follow. And unlike other statutes, statutes of government sites, for example, in the Baldwin case, Before we get to other statutes, can I follow up on Judge Englehart's question? Yes, Your Honor. As I read your brief, page 13 and 14, I think what you're saying is if Congress declares war, then it's not for the courts to reach behind and say, is that really a war? Is that really legitimate? Do I understand you correctly that if Congress were to declare war, that would be a different situation? I think that's what that is, Your Honor. Oh, exactly. Okay, so I read your brief correctly. Is it weird, though, to say that courts have to respect a declaration of war and can't look behind it? So courts have to respect Congress initiating an offensive military action, but we don't defer to the President in engaging in a defensive action. Doesn't that sound strange? I don't think so, Your Honor, for a few reasons. One is, I think in historical context, the founding leader of Congress felt like the war powers was theirs, so they wouldn't be giving that same definition. Congress would not. The President has no war power? And so back then, Congress would have seen it as their war powers, but it's not. But I think the other difference, to just get to your point, is a declared war is just a political legal act. It's sort of objective, binary, but that's a declaration Congress can make. But I encourage your invasion as something different, that you need to look at it. If I may, let me focus my last question here. Just to follow up, though, on your point that the declared war clause, I think you said that's just a legal political action. Right. I could not agree more. That's, in fact, my point. The Constitution specifically distinguishes between the power to declare war from the power to engage in war. And it gave Congress only the power to declare war. Why does that not leave, naturally, the power to engage in military action to the President, as every recent President has certainly embraced from administration to administration? Yeah, so let me unpack this. I think there's a few things in there. One is, this case about whether the Alien Exit Act can be invoked has no bearing, one way or the other, on the President's Article 2 powers to use the military. And, in fact, people are debating whether the military use of Venezuela was satisfactory or not. But nothing in this case would inhibit the President's Article 2 powers. This is a separation of powers question. Congress gave this power to the President. The President is relying on this statute. And Congress was very clear of when it could be used. And it specifically said, is there an invasion or incursion or a threat or attempted invasion or incursion? Not. Does the President deem it? So, for example, the government cites the Dalton case, where it just said, does the President approve or not approve of military bases? Or the statute that was involved in Trump v. Hawaii involving the travel ban, where the word deems was used. So if we're looking for a limiting principle, I don't mean to cut you off, but if we're looking for a limiting principle, which seems like what you're arguing, where would you draw that line? Is it with Article 3? Or is it something else? Well, I would draw the line based on the statute. I mean, our argument is strictly statutory. It's not a constitutional argument. And so we're simply saying that the statute has real meaning, as McConnell said. The courts can enforce that. An invasion or incursion, which the company keeps as declared war, was about military institutions. So to your deference point, I think the panel is correct to say this is not really a deference case. It's really a legal question. The President has made no bones, and the Proclamation makes no bones up. This is about drug dealing. Counsel, I want to ask you about that. Duncan, over here. That's all right. I never could get the hang of it either. So my question is about deference and its following up on what Judge Ho asked. You said that this statute, there's judicial review here. Okay, so my question is about that. I've read the Proclamation, as you have, and there are a number of statements in the Proclamation. And I want to know, which statements can a court examine, can be examined by a court? So, for example, in the second paragraph of the Proclamation, it says TDA is closely aligned with and indeed has infiltrated the Maduro regime. Can a court go behind that and say, well, no, it hasn't? Or do we have to defer to that statement, that Proclamation? Right. Thank you for that question. So obviously the panel in this case deferred to factual findings, but said we can interpret the statutory terms and decide whether those findings satisfy. But I want to know what's your position. And that's all you would need to do in this case. So even if you were to defer to that, that might hit the foreign government prong, but it wouldn't go to an invasion of our courage. Okay, but do you think we should?  Our position is that you don't need to defer completely to factual findings. There's a reason to believe. Whether it be a conclusory, just labels, or there's clear contradictory evidence. The one thing I can... Where are we going to get that evidence in order to go behind that? Right, right, right. So the one thing I was going to say about that is the government has urged you to go outside the Proclamation by repeatedly citing an FBI assessment, which is at best lukewarm and barely says anything. They have strongly opposed our submitting the National Intelligence Council 1780s assessment, which directly refutes the FBI and says McDermott was not directing that. And so I think to the extent you were going to look at factual findings and they were conclusory, you would look at official documents like that. But again, I know that this is not responsive to you. Well, no, it is responsive. You're saying a court can examine that statement? It can. I think factual findings would certainly get some deference. But I think, for example, after 9-11, courts looked at the record of whether there was actual hostility to bring people within the AUMF. In Hong Kong, the court looked at whether the President had made out the requirement of necessity to use military permission. But I think at the end of the day, I'm not going to say that factual finding wouldn't get some deference. What I do think is the application of law of facts here, where it's essentially a legal question. Does drug smuggling or migration constitute an invasion? I've heard it in the meeting of those targets, 1798. Counsel, let me ask you about what seems to me the strongest statement from the Supreme Court, quite dated, that there is broad discretion, perhaps, even on determining whether there's been an invasion. And that's the Militia Act. That's Martin v. Mott. And the language there, unlike the AEA cases after World War II, or depending on what the Supreme Court should be interpreting, saying we're still doing World War II, that does talk about interpretation and constitutionality. That's not in Martin v. Mott, different statute, Militia Act. What do you say to that? Well, I think you're right, Your Honor. And for reasons you just said, and what you said in the panel opinion, that Mott is different in a few ways. There's language, discretionary language in it. But it also involved discipline within the military, which is that classic Article II presidential prerogative. It also, I think, has been modified going on. I think Sturgeon suggested that it shouldn't be read that broadly. And it's also obviously, as I said, different context. Well, let me ask you this. What about if he was aware of Mott and said, nonetheless, there's interpretation of the  And I think that, at the end of the day, is positive, that this Court can review it. You did say that 28J, I don't think, maybe you don't consider it particularly relevant, but there's the Trump v. Illinois case from December 23 dealing with what looks to me like the successor to the Militia Act, a modern codification of two of the provisions. How do you interpret the majority opinion there? It was on the, we would call, motions docket, emergency docket, a pleasant way to put it. So how does that opinion affect continuing vitality of Mott v. Mott? Well, I think it changes substantive rule for sure. It says that the President needs to first try out the military. But I think, insofar as we're talking about judicial review, it clearly said, well, we can interpret this act. And so, at the end of the day, I think Mott was a different context involving military discipline. I also don't think that the conclusive language to be sentenced floating around in Mott was about courts have to treat it as conclusive as opposed to militia. People can't just assume in disregard of the orders. I think there's a lot different. But at the end of the day, I come back to JTT, which said, in this context, with this language, there has to be an interpretation of the act. Counsel, can I pause you on your answer to Judge Southwick? Because I have a similar, if I understood, you said that Sterling v. Constantine limits Mott v. Mott. Is it your view that a federal district judge, in that case, could have questioned the governor's determination of an insurrection? I think that's exactly what happened. And help me understand. The factual findings, was the Supreme Court describing those factual findings and said, the district court found that there was nothing here remotely like an insurrection. And do you remember what the insurrection was in that case? It was various oil companies. I think that's what you're getting at. I'd like to hear your take on it. Well, no. I mean, if you're asking me, it's factually different, of course. But I think the point was— Oh, no, no, no. Sorry. To be very clear. Not my question. What I'm asking is, do you remember what the nature of the insurrection was in Sterling v. Constantine, your lead authority for the idea that Mott v. Mott has been limited? We can get to JGG in a minute. But your answer to Judge Southwick was, well, there's all this stuff in Mott v. Mott. And, yes, it's really bad for my clients. But let's talk about Sterling. I'd like to ask you about it. What was the insurrection? Right. It was, I mean, that the oil fields are not producing oil at all. In the district court. Yes. And that's great. In the district court. And you're quite right. The district court looks at that, and the district court says, oh, gosh, this is not even close to an insurrection. And what does the Supreme Court say in response? I think what the Supreme Court says is we uphold that factual finding. Incorrect. Incorrect. The exact opposite. They reverse, and they say that that is the determination about whether and to what extent this statute applies is conclusive on the Governor's proclamation. Your Honor, I think they ultimately – That's their word. It's on page 399. I think they ultimately said the district court's findings were of help. And so, but, you know, I don't want to sort of die on the hill of the interaction between Sterling and Mott. At the end of the day, I do think courts avoid Sterling to modify Mott. But ultimately, Mott is a different case. We have JTG now saying proper interpretation of the Act is – On the interpretation of the Act, I'm just – the President, as you began, has used this Act three times when Congress has declared wars. It allows the President to have sort of collective and summary removal power, declaring foreign nationals in the country to actually be enemy combatants. Is there anything in the three sections that make up Chapter 3 of Title 50 that says court review is strict?  Okay. And then is there, in fact, one of the three sections is the indivisible, indispensable role courts must perform, which is Section 23. In other words, proclamation deems people to be enemy combatants. Then the only way they get removed, is this correct, is that they have a hearing in front of a court, and a court determines that there is cause to find. My question is what? That these people are infiltrators, and a foreign government is behind them? Number two, also, that they present a public safety danger? And number three, in this case, given the proclamation that they're members of a particular gang. Do courts, therefore, have an absolutely indispensable role, as opposed to no role? Well, I think they absolutely do. Just to put a change to Section 23, that's sort of a unique provision about civilian complaints. I want to put that aside. But I think your fundamental point is there is zero language in the statute, which, of course, is consistent with J.P. Winston's review, including review. And so you contrast that with statutes that talk about either in the president's discretion, or if he deems something an offending. And I don't think Congress, and I'm going with its war powers, would have ever given the president a blank check to say, we're going to let you refine and further our innovation any time you want. The implications are so extraordinary of invoking this action for the fourth time based on drug smuggling. We're talking about the potential to make every federal and nationalist country, and in the area, even lawful permanent residents, serve in the military. It would be an unbelievable precedent. And I don't think the fact that it's only been invoked three times is coincidence. There's obviously many times where there's been drug smuggling. Take Noriega, for example. We went in and captured Noriega the same way we did Maduro. The indictment in Noriega is identical to the Maduro indictment. In fact, if we should have invoked the Alien Enemies Act there, we could have more easily done it, because the General Assembly of Panama had actually declared war against us. The idea that we're going to use this for ordinary crimes outside of wartime in the military is ahistorical and would have such enormous implications. And the disconnect here is that the government is repeatedly saying to you, TDA is dangerous. So be it. The National Intelligence Council is suggesting there are minor, but again, peripheral presence in the United States, but so be it. Accept it. The question is not whether they can be removed swiftly, even under expedited removal provisions, whether they can be put in an alien terrorist court, and they can criminally prosecute, it's whether we are going to be allowed to use this wartime authority for the fourth time in the country's history. Mr. Geller, we've been given an assignment from the Supreme Court, and we've been told that in resolving the detainee's appeal, we should address all of the normal preliminary injunction factors. We've also been told that the government may remove the name plan that's subpoenaed to class members under other lawful authorities. So could you please remind us what is the status of the named plaintiffs, please, so we can know to help us in going through the factors as to the named plaintiffs. Thank you for that question, Chief Judge. Two of the named plaintiffs have now been removed under the immigration laws, which is, of course, consistent with our position. So which have been removed? Is it WMM or FGM or AARP or AARP? I don't know whether it's AARP or just AARP. The Supreme Court does AARP and we do AARP. The reason AARP was changed, and this is sort of a tangent, is because the organization AARP cannot allow any confusion. Okay. The two that were removed were WMM and FGM. Okay, so we're down to AARP is the named plaintiff in this. So what is the status of AARP in this case, please? We believe that he is in the custody still. It's difficult to reach everyone. I'm sorry. Is he lawfully present? Is he under some special protection? Is he removable? He has been tagged as an alien enemy under this proclamation. I'm sorry? He has been named an alien enemy under this proclamation and is being detained. I'm sorry to pester you on this, but it's important to know whether or not we can even grant relief under the injunctive standards of whether or not he is removable at will by the government because he failed, he didn't respond to his NTA, or maybe there isn't an NTA. Is there an NTA? Did he respond to it? Yeah, so he is in immigration proceedings. And we are trying to update his status before we got here. We certainly can supplement that. But all of these individuals were put in immigration proceedings and they want to apply for various forms of relief like asylum, so they would have got some basic due process in their immigration. So we will update you if we think he's not any longer in immigration proceedings going through that and no longer detained. But whether he's detained or not, if he's not lawfully present, he would be subject to removal otherwise, and that might affect whether or not we can grant relief or what the factors even that could be. Right, so let me be as crystal clear as possible about that. Even if you're here unlawfully, you're allowed to apply for various forms of relief, perhaps most prominently relief against torture, relief against persecution if you're sent back. The reason the government wants to use the Alien Entity Act... We do lots of cases of removal. You have to do these. You have to exhaust the timeliness. They're trying to go through the immigration proceedings. The reason the government wants to use the Alien Entity Act, the practical reason they think that it's better for them, is it immediately takes them out of immigration proceedings and doesn't allow them to apply for any of those forms of relief. So whether he's here lawfully or not, does it affect his ability to apply for these forms of relief? Excuse me, sir. Once he's back in Venezuela, he can go to the American Embassy and apply for re-entry with asylum, can he not? Wasn't that the whole point of the Remain in Mexico policy? I don't think at this time he can. But again, this is a putative class, and so I think if the government's trying to move it, I think the fact that it's a putative class... I don't think the Supreme Court anticipated the government moving this. Well, they said the government can pursue the last line of the majority opinion, so I'm just... I assumed that if they wanted to stop that, they would have said all other immigration actions are stayed. But maybe I'm wrong. Well, I think most people are not being moved, but some have, and there are lots and lots of people now sitting in detention under this Alien Entity Act. OK, so you'll let us know about this particular person who is the named plaintiff, the only remaining named parent, and whether or not they're currently in immigration, whether they are here lawfully, whether they're here... you know, they could be picked up at any time and removed, what is their status, and whether they've exhausted. That would be helpful information to the court, and I'd appreciate it. And I think my colleagues may have a couple more questions. I have one question, counsel. I just want to make the record very clear on this. My understanding of your answers to the Chief is that you have one named plaintiff left in the country, and you did not communicate with him before you showed up today? That's what I heard you say. I just want to make... yes or no? Your Honor, I think that... I cannot tell you the specific last time. I don't know that we've talked to him this morning. That wasn't my question. You did not communicate with him? No, we didn't. I mean, we have... There are lots of people in the Alien Entity Act. I don't think we've communicated with him specifically, but I don't... You know, I just want to make sort of an obvious point. We reached out, and there are detentions. It's hard to reach people. And so that's why I will update you sooner or later. The detention center allows people to get through, and so we will do that. Which is one of the reasons you want more notice time. That was a friendly comment. That's exactly right, Judge. You know, ordinarily, if you were corporate counseling, you just had a 5, 6, 7 days is fine. But this is a very different situation. Thank you. You saved time for rebuttal unless someone else has a question. I don't see any more questions. Mr... is it Ensign or Ensign? Ensign.  Good morning. May it please the Court, Drew Ensign, Deputy Assistant Attorney General for the United States. The present proclamation is a clearly lawful exercise of its extensive powers under the Alien Entities Act, and the revised notice procedures adopted on the pre-mandate conform with the requirements of due process. The present determination is that the prerequisites for invoking the ADA are satisfied, are subject to only extremely limited and deferential review. Regardless, the proclamation is alive under any standard of review. The Alien Entities Act has only two relevant prerequisites here, both of which rely solely on the President's findings and the relevance of military conduct and foreign affairs where the President is due the utmost efforts. It is for that reason that the Supreme Court in the decade refused to question the President on whether or not an acquired war existed long after the guns had fallen silent in World War II and the Nazi regime had long since ceased to exist. As to the first key requirement, an actual, attempted, or threatened invasion or predatory incursion, the proclamation in record easily satisfies this requirement. Contrary to pointless contention that the ADA requires an actual, quote, military attack on U.S. soil, end quote, Congress deliberately chose to use broader terms, such as attempted or threatened invasion or predatory incursion, which reach far beyond attacks on U.S. soil by formal military forces. Pointless construction would nullify those terms that Congress intentionally and specifically adopted. Similarly, we think the panel erred when it held that the ADA required, quote, armed forces of some size and provision, end quote, and an, quote, armed organized force, end quote. The ADA was enacted in specific response to the French use of privateers, which were often solo ship operations, which were little better than pirates armed with mere scraps of paper from the French Revolutionary Government in the form of letters of marriage. They often had either size, work, or region, and instead of open-right lips or insects, quote, the privateers' activity bordered on unabashed piracy, end quote. But other than the panel's construction of the ADA, Congress bizarrely drafted a statute that failed to address the very circumstances that had motivated the enactment of the statute. And more generally, the panel's frank construction of the ADA simply reads attempted or threatened out of the statute and refuses to recognize that those terms modify predatory incursion, too, and not merely invasion. Plaintiffs are also mistaken in contending that the ADA requires ongoing armed hostilities. Indeed, not even the term declared war requires actual armed hostilities, as the indefinite case powerfully demonstrates, upholding the continued use of the ADA years after the hostilities in World War II had ended. Moreover, the act allows for both attempted and even threatened actions to qualify for the statutory prerequisites. It is thus necessarily not limited to actual armed conflict. The evidence also powerfully supports the president's conclusion that TDA has engaged in a predatory incursion or invasion. TDA has infiltrated at least 40 states and taken over entire apartment buildings. It is false. TDA's point is not telling me that we could argue that those occupations of apartment buildings do not qualify as predatory incursions or invasions even under their construction of those buildings. Similarly, the FBI has assessed that TDA is likely to carry out targeted assassinations in the United States, as it has already done in Chile for a critic of the Maduro regime. The FBI's well-founded assessment readily satisfies the ADA's prerequisites here. As to the second key requirement, the proclamation was later explained why TDA was connected to the Maduro regime, which was unquestionably a foreign militia government. Pointers appear to contend that because TDA members are only a subset of Venezuelans, that the proclamation is somehow deficient, but that flies in the face of historical evidence of precedent. In the War of 1812, for example, the president limited the ADA only to all British subjects that were within 40 miles of the Titanotter and not all British subjects. Similarly, the indications of both World War I and II were more limited, and the Peace and Circuits specifically held the more limited indication of the ADA in the Citizens Protected Lease case, reasoning that that was a misuse of the ADA. So for all of those reasons, we think the proclamation is valid on its face, and for the reasons we've explained in our briefs, too, we think that a revised due process procedure is important to the process. I welcome the first question. Counsel, let me ask the same question I asked your opponent. Where do you see, when I say limiting principle, I mean an opportunity for review. Where do you see the line drawn on that? Is this solely an Article II prerogative, in which case the opportunity for review would be with the electorate, public opinion, and ultimately at the ballot box, or is there some other limiting principle or reviewing principle that we need to be made aware of? Much of this is certainly committed to the political branches, but as the Supreme Court suddenly got invigorated in JGG and questioned the constitutionality of construction, as pure question of the statutory construction of law, are still available. Now, constitutionality is not being challenged here, so we're at questions of interpretation. So I think this Court can interpret what the terms of the statute mean, but that's entirely different from the factual questions of whether or not there's an attempt to threaten invasion or predatory virtue. Counsel, if you say that the Court can construe what the statutory terms mean, and I agree completely, as the panel opinion shows, we then have to do something with that, we're then entitled to do something with that interpretation, are we not? So your point basically is the panel misinterpreted invasion, but that we still had the authority to interpret invasion and apply it to the facts of the case and decide, is this an invasion? I expect that's not quite your position, so I'd like to hear your answer. So I think the Ludetti case makes it quite clear, or is very instructed on this point. In the Ludetti case, if a court was asking the application of law to facts, is there an actual armed hostilities, the answer to that question is clearly no. You know, for four years there hadn't been any shooting in World War II, there was no Nazi regime, there was no semblance of the Nazi regime, it was all gone. If the question was open for the courts to apply law to facts, as they did in other cases, the Ludetti should have absolutely come out the opposite of how it did. Indeed, the centers in Ludetti recognize the idea that World War II is still a mature fiction. But nonetheless, the president's resolution of that factual question is conclusive. Well, counsel, still the answer, certainly Declaration of War is the one objective, you can look at a piece of paper and tell whether it's a Declaration of War, it's the one objective event, I think is the statutory word. And you have acknowledged that we can interpret what an invasion means, what a predatory incursion means. It does seem to me that Ludetti, in talking about have the effects of the war, or German aliens is what all three cases are dealing with, two of them, the aliens still being in this country, are they still some risk to this country? And they left that decision for the political branch. But Eisenträger in particular makes it clear that interpreting whether any of the three, though he's talking about the Declaration of War, let me start over, the Eisenträger report specifically said that we can interpret whether it's been a Declaration of War. Easy, and that would also mean less easy, we can interpret the other two phrases. Isn't that, you interpret what has probably been invoked, and then the political branches have their way with whether people are dangerous or not, etc. I think that would seem to be what all three of the World War II AEA cases mean. Well, I guess I have a reaction to that, Your Honor. First of all, I think JVG would definitely be clear that the question of construction is a valid report, but they never said that the application of law of fact was open for forced re-examination. So why are we construing it, just for the fun of it? Well, I think that... Law review article? I mean, it's got to have some bite to it if we are going to construe it. Not necessarily, Your Honor. I think Martha B. Mott makes clear the President's determination that there was an eviction was conclusive. Well, but that's not an AEA case, and it far precedes the Deccan. It doesn't precede the Deccan, but it's still good law, and it makes clear the President's determination that there was an eviction was conclusive. Is it still good law after Trump v. Illinois? I think so, Your Honor. I think that was a different question of statutory construction of what the regular forces meant. I think that meant something very different. Didn't the Supreme Court disagree with the President's interpretation of that statute and said it could not be invoked on that basis? I think it disagreed with his interpretation of the statute, but not with the factual findings that make them. I think the court can interpret the statute, but I don't think that I can interpret the underlying factual conclusions there. And here, it would be a disinvasion. But I think, even if you thought that some factual review was available, I don't think it is in the Deccan. But even if you did, I think it would be under an extremely deferential standard, likely that from Trump v. Hawaii, which merely requires that the President's indication be facially legitimate and verified. And I think that is the maximum possible amount of review to be available. And I think in Deccan, it's clearly not available. Can I follow up on Judge Southwick's question? If I heard him correctly, and he'll correct me if I didn't, there is interpretive power. And in Ludecky, it was, I think, to use Judge Southwick's words, declaration of war, it requires you to look for a piece of paper that Congress has blessed. Is it your view, then, and I alluded to this earlier, you do the same test with regard to invasion? Is there a piece of paper issued by the President indicating that there's an invasion? Same review as Ludecky. We need a declaration of war in Ludecky. We need a presidential certification of invasion here. But either way, that's the interpretation, and that's what we're limited to. I believe so, and I believe that's a correct reading of Ludecky, President Truman's... And that also treats the statute, we're treating equal terms of the statute equally, right? Declaration of war, we need a piece of paper from Congress. Invasion, we need a piece of paper from the President. But they're the ones elected. And there's no reason to believe that Congress intended to differently apply to the various provisions of the same act. Because the statute seems to use these terms equally, right? If there's a declaration, we trigger the power. If there's an invasion, we trigger the power. Declaration comes from Congress. Invasion comes from the President. Yes, Your Honor, with the minor caveat that, as Chief Prematory incursion and invasion, Congress further saw fit to modify them by attempted or threatened. Of course. I think there's even greater deference to the President on those terms. But who determines what is an invasion and what is a predatory incursion? The President or the courts? The President does, Your Honor. Then what are we doing to interpret the statute? You're interpreting the statute, and then you can see if the... I mean, we're not interpreting anything if we just have to take the President's definition or declaration of an invasion at face value. We can't question it. We're not interpreting anything in the statute, are we? Well, I think if the proclamation failed to set forth that there was a predatory invasion... Well, then it wouldn't even trigger the AEA in the first place, would it? What... Yes, if you see a proclamation before you that doesn't validly invoke the terms that satisfy the AEA, I think that's the function that you usually... But that's interpreting the proclamation, not the statute. It is... It's recognizing the President's prerogative to determine the relevant facts and I think... Not facts. We're talking about the law. The statute says predatory incursion. And Ledecky says... I mean, I'm reading it like I think you're reading it. It says, barring questions... It says it precludes judicial review. But then it says, barring questions of interpretation and constitutionality, the Alien Enemies Act is such a statute. No judicial review. But they've carved out interpretation and constitutionality, and they've repeated that in JGT, right? Very recently. They did, Your Honor, but I think Ledecky makes clear what the boundaries are and where... If you were open to a court to examine whether or not what the facts were, the idea that World War II... I'm not talking about the facts, because, I mean, I think I agree with you as far as what Ledecky says. It takes that out, puts it in the political branches, even though, and it says, such great war powers may be abused, no doubt, but that is a bad reason for having judges supervise their exercise. That's different, though, than interpreting the statute. I'm just sort of struggling with what's left if we defer to the President as to what these terms of the statute mean. What's left is to see if the Proclamation satisfies, on its face, sets out the relevant statutory prerequisites, and to the extent that the President's found requisite facts, that's conclusive. But I think even if you don't accept that point, Don't we have to know what the Congress intended when they used the word invasion or predatory incursion? I'm not talking about the facts, but I'm talking about what does it mean to interpret those terms for the Court? You said the President gets to say what an invasion is or say what an incursion is to define those terms. Am I misunderstanding what you're saying? Occupation of an entire apartment building, totally ignoring the TEA's very bad target of assassination? As I understand the hypothetical, I believe so, because then you would be second-guessing what the determinations of the President were. You would be saying that what the content of the Proclamation is is insufficient to satisfy the terms of the ADA. And I think that's a different question. That would be within the Court's interpretive power as opposed to the application of law to pass. But I think your argument here, or at least as I read the Proclamation, is that that's not what the President has proclaimed. The President has proclaimed the union between a transnational gang and a foreign government. That's absolutely correct, Your Honor. And I think that's underscored by the fact that the Maduro regime used the TEA to assassinate the Maduro regime. So it wasn't simply going after TEA's implements. They were going after the implements of the Maduro regime. And the President set forward the deep connection between them and how it is intimately tied up with the Maduro regime. And we think that satisfies the requirements of the foreign state or government requirements of the Section 21. So going back to Judge Wilson's question, so short of judicial fact-finding, what are the concrete limits, if any, on executive authority under Section 21? I think the President has to set forth conditions that would satisfy it. And I think he could do that. I think he could do that on the basis of the Proclamation, in which case it would be conclusive. I think that this is not an APA case, and I think this is an issue we take with the panel majority, is that the APA does not impose the same sort of paperwork, show your work requirements that the APA does. So I think even if he thought that the Proclamation on its face wasn't sufficient, I think the President should be given the opportunity to present evidence to further support and supplement the Proclamation. That's what we've done here. Point is, if you basically refuse to engage with it, you will search and bang for the word apartment in the brief, and you won't find it. That sort of non-engagement with the facts is, I think this is not an APA case, nor is the President in agency with it. So I think the President can set forth the relevant facts, either in the Proclamation, or it will act to further supplement that. In the record, we've done so here. We think both are sufficient to justify the indication of the APA here. What makes a predatory incursion distinct from an invasion? I think it is certainly less. I think we can start with what everyone agrees, a predatory incursion is less than an invasion. I think the First Circuit has gone all the way to recognizing that fishing boats coming into U.S. territorial waters could satisfy the meaning of predatory incursion in a different statute. So it's certainly lesser than that. I think one aspect I can take issue with the panel opinion is they thought that a predatory incursion was simply a failed, attempted invasion. And I think that's wrong. For the first reason, that attempted to threaten modifies predatory incursion and not just invasion. And so I think that fails to recognize the modification of it. I think that it is what certainly physical occupation of the entire Department of Health means, regardless of status. Yeah, but tell us what makes an incursion predatory. What is it? That word has to do some work. It does. It has to. I think that people doing it have to mean us harm in some way or have to be inflicted harm upon us. But TDA is excessively violent. And they have engaged in a wide variety of activities, like murder, kidnapping, and rape, that are less than the sort of activities that you would consider to be predatory. I don't think that's. You know, they quibble with it a bit. And you see on page one of their brief that will only allow the TDA has engaged in alleged crimes. But realistically, the evidence here is that they've engaged in quite a number of activities that readily satisfy the predatory requirements. And again, I think the occupation of the entire Department of Health is not the sort of ordinary crime. Counsel, let me get you back to an earlier question in exchange you had with my friend Judge Duncan. You said that, if I understand the gist of the question, that there was no allegation, no declaration in the proclamation that it actually was a group sponsored by, directed by a foreign national government. It's just private parties coming in. And that could not be an evasion. You could look behind the proclamation that made that sort of assertion. Did I understand the exchange, and you would agree that that could be part of our interpretation and we could declare that was not proper? I don't believe so, Your Honor. I think the point that I was attempting to make is that this is not an APA case. There's no Chenery principle here. Well, I'm not talking about Chenery or anything of the sort. I'm talking about what I thought you had. I don't want to use the wrong word like concede. But I thought you had agreed that if the proclamation did not actually allege that it was a foreign national government who was doing the invasion or predatory incursion, that would be insufficient. And if I misunderstood, then I'm on the wrong track. I think you could review those terms. I think that Review them and say there's been no assertion that a nation or government is behind this, and therefore the declaration fails. Not that application of law, in fact. I think you have to treat the President's resolution and contested factual questions as conclusive in this context. But even if you didn't think that, in a very real moment, it would have to be reviewed at an extremely deferential standard. But I'm not sure why you're fighting what Judge Southwick is suggesting. Earlier you mentioned, I don't know if you mentioned, did you mention French privateers? I thought you did. I did, Your Honor. Well, if there were no French in the privateers, then it was just privateers. It was just pirates roving around who had no alliance with the French at all. So they weren't irregular troops, so to speak, of a foreign nation. That wouldn't be a no. I think that's correct, Your Honor. If we saw on the face of the proclamation just solely failed to identify a foreign state or government, and that's lacking, then I think that is something that is within the scope of the court's review. What if it was fanciful on its face? Like, what if the proclamation said, we're having a British invasion. They're sending all these musicians over to corrupt young minds. And they're sending it via, you know, and the prime minister is in on it. And they're coming over here, and they're taking over all kinds of, you know, establishments. Would that be, would you be able to look at it on its face and say, it doesn't matter what these facts are and what they say, at some point it's not credible? Or is there not a line like that? And I'm not trying to in any way, by giving a fanciful example, insult either party. I appreciate that, Your Honor. And I think the better answer to that is no. And Becky kind of makes that clear. The idea that there was still a World War II in 1949 was quite fanciful. And the dissent recognized as much. And nonetheless, President Truman's determination that there was still World War II is still ongoing. That's what the Supreme Court treated as implicit. So I think that's the resultion of pain here. So in the British invasion context, that would be OK? And we would defer to the proclamation? Come on. I suspect that. Your point is not that it's OK. Your point is that the solution exists outside of the judiciary and in a political process like the 25th Amendment. Isn't that good? Well, and certainly Congress can take action. Judiciary is not the only solution to the woes of America. No. Indeed, these sorts of questions of foreign affairs and security of the nation are precisely the sort of questions that are entrusted to the political branches. Congress could also take actions like refunding to fund activities that it found objectionable. It could also repeal the AEA if it was being misused. There are a wide variety of political solutions to a political problem. But we don't think it's within the power of the Article III judiciary. Counsel, I'm not sure you're grasping Chief Judge Elrod's question. I think she's talking about the Beatles. I think so. It's trivial. The law does not concern itself with trivialities. I did think that it was the Beatles. I certainly didn't want to suggest anyway that the hypothetical was trivial. Well, I said it was fanciful. So the point is, is there a limit to the deference? It goes back to Judge Wilson's question. Is there never a rule? Or is there at some point where it becomes preposterous on its face? Or is it always defer, defer, defer? I think the better answer I'm going to give you is that it is a question of the political branches. The solutions are political. But nonetheless, if you disagree with that, we are still in the sort of context where extreme deference would apply. And I think the sort of Trump-y gawaii at most you could review whether or not it was facially legitimate and modified. And that is, even if you thought, Rebecca, notwithstanding that you could second guess the determination of the President, that would be the maximum extent to which a court could engage you for that second guess. Does the government have any information on ARP? Is ARP criminal, alien, removable? I don't have specific on that particular alien. I know, in general, many have been removed out of the AEA. We're asking about the named plaintiffs only for the purpose of this assignment we have from the Supreme Court about the injunctive factors. We've treated it as a prospective class being in front of you. I don't have any reason to doubt what opposing counsels represented, and I can certainly check. They didn't say anything. They said they'd have to go check themselves. So nobody knows whether ARP is criminal, alien, removable, and by statute can't be kept, what the status is. Before this, I asked DHS. I didn't get specific information about the named plaintiffs. I did get about the class. What I can represent is many have been removed under Title VIII, but certainly there are AEA designees that have not been removed from the United States. We think there continues to be a lot of case controversy. These are individuals that the government can't import and remove out of the AEA. Sir, are you conceding that there is a class action possibility here which has not been certified yet? We're certainly not conceding. This case arises in an extremely odd procedural posture for many reasons. I just wanted to clarify that. Nonetheless, the Supreme Court granted relief on a sort of class-wide basis, which is kind of the procedural posture in which the case arose. Well, I sort of agree with the Chief, however, that they didn't resolve that definitively. They certainly didn't resolve that definitively. The district court did resolve it and then vacated that order. But the Supreme Court says, all of the normal preliminary injunctive factors, including likelihood of success on the merits, as to the named plaintiffs. It does not say as to the putative class in that section. So that is a question of homework that we have as to the named plaintiffs. I don't understand your argument for revocation of that information. Can I ask for a question? Just to help go back to Judge Wilson's questions about the interpretive scope. The hypothetical is this. There is no presidential proclamation. The president's done nothing, hypothetically. A soldier on the field decides there's an invasion, a terrible invasion, and I'm going to start detaining people. A soldier does that. Would we review that? I certainly don't see any reason why not. Right. So that's it. Whereas here, the SECDEF, same thing. All right, SECDEF issues a proclamation, no presidential backing. That would not justify ADA. Yes, Your Honor. I agree that the court has said that you can disprove the terms of the statute. The statute requires the president to make the proclamation and not the Secretary of Defense. If you see a proclamation from the Secretary of Defense, you can and should say that's not going to happen. A single member of Congress declares war. Absolutely. Certainly not. Picking up on Judge Ho's question, I assume you can also review the remedies. So in Sterling v. Constantine, for example, the Supreme Court says, look, the findings of the president of the United States, or in that case, it's the governor. But the finding of the executive, absolutely conclusive. But that doesn't mean you can do literally anything. So for example, Section 21 says you can apprehend, arrest, restrain, remove. If you started doing summary executions or some other thing that's not listed in the remedies, I assume that's also reviewable. Yes, Your Honor. And I think it's important to note, too, that the Supreme Court made clear you could review the application. As to whether particular aliens are members of TEA. And that's another important question that is within the scope of judicial power. But the official validity of the proclamation stands apart from that. So the factual question as to particular aliens will be reviewable by courts. But as to the president's determination as to whether or not the nation faces an attempt to direct a predatory purge, that's not listed. Counsel, let me follow up just a bit on the hypothetical. Congress doesn't do declarations of war anymore. Authorization of the use of military force, Gulf of Tonkin Resolution. If the president stated, because Congress has issued, Congress itself has issued the equivalent of a declaration of war, I hereby invoke the Alien Enemies Act. What about that? Can we review that? The president says it's been an effective, an ersatz, an artificial, for all good intents and purposes, a declaration of war. And I'm going to invoke the Alien Enemies Act. Could we interpret and say no? I, and that's obviously not presented here. I suspect the answer to that is yes. And that is the sort that strikes me at least at first blush as a sort of issue of statutory construction, not to which J.G. and the deputy were reviewing. There's no particular factual obligations on which the president has expertise or deference there. That strikes me as a pure question of law, a statutory interpretation. So I suspect the answer to that is yes. I haven't given it more thought than these 15 seconds. But I suspect that would be yes. Thank you. Oh, did someone have a question? Otherwise, thank you very much. We appreciate your argument. Thank you, Your Honor. We'll hear rebuttal from Mr. Gellar. Thank you, Your Honor. Just quickly on your questions about the main plaintiffs, we will obviously get back to you. And I think ultimately, we're trying to reach its local counsel. But I do agree with the government that the Supreme Court is essentially treating this as a punitive class for purposes of this case. But not for the purpose of the injunctive relief. We're supposed to analyze that on the main plaintiffs, aren't we? Well, I think because if there is a class being treated like that, the case wouldn't move if they're incapable of requisition. So we do agree with the government on that. Just a couple of quick points. Mr. Gellar, before we move to the points. Over here. Yeah, sorry. Back to the main plaintiffs. Did the government represent to the district court below that it would not remove the main plaintiffs? It represented that it would not remove the main plaintiffs. I believe, though, all of them under the Alien Abuse Act. And we agree that, consistent with our position here, that nothing about this case stops the government from removing all of these other tools. So our understanding is they were removed not under the Alien Enemies Act. The Supreme Court has a stay in place, but under other authorities, which is, of course, our point that the government doesn't actually need the Alien Enemies Act. But just on that point about the government claiming that they have irreparable harm by not being able to use the Alien Enemies Act every day. This court, granted, we hear it out loud, we find that you have an institutional interest in that. But think about it from the government's standpoint, them saying they need to use this every day. The Supreme Court put a stay in place pending its moving back to the Supreme Court and the disposition of a cert petition. What that means is that the government now is going to delay getting back to the Supreme Court. And even if they win, it will be a 12 to 18-month delay before they can use the Alien Enemies Act. If the government genuinely believed there were no other tools to use and they needed the Alien Enemies Act for a very real national security reason, they obviously would have gone directly to the Supreme Court. I'm sorry, that doesn't fly with me. They just want to maximize their chances of winning at the Supreme Court. Isn't that the simplest explanation for what the government has done? I'm not saying it's the right legal strategy or not, but isn't it an imminently plausible legal decision? Your Honor, I think that if they genuinely thought that they needed to use everything, but I want to be careful here. I don't want to suggest that. They would have rather won at the panel. I don't want to suggest that. All I'm saying is whatever the outcome here runs out of the Supreme Court, I do want to be fair and say your opinion might have persuaded the Supreme Court and that was for a few months ago. Mr. Gill, about the posture of this case, as I understand it, it's essentially a judgment like a Rule 12b-6. Is that correct? I think so, Your Honor. I do want to echo my friend's point that this is a very, very odd posture. Well, we don't. But we're bound by the federal. I know what this is. If I contradict the Supreme Court, God be helped. Help me. But I know the federal rules of evidence. And the procedural posture of this case appears to be essentially equivalent to 12b-6. I would agree. All right. But going from there, suppose we would get reversed and the court declares, well, let's not think about that. But is it your position that suppose the court had not entered judgment but he had gone further and said, well, we need some discovery, and I'm going to set an expedited timetable, and I'm going to ask for a trial? A, would that be appropriate? And B, if it is, are there Seventh Amendment rights at stake? Could a jury be asked to decide this? I don't think that's a good question, Your Honor. I haven't given it enough thought. I'm not sure this would be a Seventh Amendment jury case. It would be civil. But I think where the discovery might matter for Judge Salford's second panel is on due process. If I see my time, Your Honor, can I just give you a couple of points? Sure. The government's argument is essentially this. They're saying it's only the president who automatically does it. Congress put it in very specific terms. And what you have here is not a situation of deference. You have essentially a straight statutory question. Would, in 1798, Congress have thought drug smuggling and migration constituted an invasion or an incursion within this military law and war law? There's absolutely no question about that. So defer to Congress, but not the president? Well, I think you could. If a declaration of war, you said, we don't look at it. Well, I think that is different. I think it's a straight-up question. Right. So defer to Congress. That's different. Defer to Congress. Don't defer to the president. And on the foreign government, I just think that this, on the foreign government nation point, we're just separate. And even if we lose on that prompt, we still, we think, as Panos said, we're not an invasion, an incursion. But a few things. What happened with privateers and Hessians and Barbary Potters is they had a formal relationship. So when they were captured, they would actually say, I'm part of the army. I need POW status. You don't see TVA saying, I'm part of the Maduro military. It was a very, very different situation. It was open warfare, as we point out in our bomb brief on page 38 and 39. The other thing about the deference that the panel gave on the intertwining, I think that needs to be rethought, because Maduro's not there. The proclamation is Maduro-centric. He's not there. So the whole thing is somewhat odd. Just very quickly, Judge Obama and Sterling, the Supreme Court, did at the end say they affirmed the Supreme Court.  Why did they affirm it? I appreciate you coming back to it, but what were they affirming? They were affirming that this Court's finding that there was no insurrection. Absolutely not. It is demonstrably not true. So I'll read to you page 399. I'm very much grateful that you brought it back. Virtue of his duty to take care that the law is to be faithfully executed, the executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive. The Court then goes on, on page 40401, to say, yes, that doesn't mean you get limitless remedies. You can't take land outside of an exigency. So they quickly modified it. But at the end of the day, what they said was that this Court found an insurrection. They affirmed that. I think we may have to do reasonably to agree on that.  I'm not sure. I'm glad I brought it back. I appreciate it. I agree with you. I agree with you. So thank you. Mr. Gellar, do you need to wrap it up? Yeah. So at the end of the day, I think the government was not going to use the limiting principle. They essentially said, drugs can be dangerous. That's not an issue, or that's not part of our argument. It's the fourth time in the country's history it's going to be about drug smuggling and migration. There is simply no way the 1798 Congress would have thought that within this wartime military statute. Thank you, Your Honor. Thank you. We have your arguments. The Court will stand in recess until tomorrow morning. What?